UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

F. Ronald Elmo, W. Scott
Schimpf, Guardian Fire
Equipment Co., and Guardian
Fire Equipment, LLC

     v.                    Civil No. 10-cv-286-JL
                             Opinion No. 2012 DNH 144

James M. Callahan, Bowditch
& Dewey, LLP, and Brighton,
Runyon & Callahan, PA

**MEMORANDUM ORDER**

English essayist Charles Lamb famously wrote that "he is no lawyer who cannot take two sides."  But it is usually bad policy for a lawyer to take two sides in the same transaction, and according to plaintiffs Ron Elmo, Scott Schimpf, and their company, Guardian Fire Equipment, defendant James Callahan did just that.  They have sued Callahan and his law firms, Bowditch & Dewey, LLP and Brighton, Runyon & Callahan, PA, alleging that Callahan committed legal malpractice by (among other things) representing both them, as the sellers in a "roll-up" merger, and the buyer in that transaction.

As part of their consideration for the deal, plaintiffs received subordinated debt and equity in the resulting company, which became worthless when that company failed almost immediately.  Plaintiffs now assert claims for legal malpractice, negligent misrepresentation, breach of fiduciary duty, breach of

contract, and violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A.  They claim that, if not for Callahan's malpractice, they never would have proceeded with the transaction.  This court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) (diversity).

Defendants have moved for summary judgment on all counts of the complaint.  See Fed. R. Civ. P. 56.  They argue that plaintiffs cannot, as a matter of law, establish the requisite causal link between Callahan's conduct and their loss.  They further argue that Callahan's conduct concerned "[t]rade or commerce that is subject to the jurisdiction of . . . the director of securities regulation," and is therefore exempt from the Consumer Protection Act.[1]  See N.H. Rev. Stat. Ann. § 358-A:3, I.  Plaintiffs, for their part, have moved for default judgment against defendants as a sanction for their alleged failure to preserve potentially relevant evidence.

After hearing oral argument, the court grants summary judgment to defendants on plaintiffs' claims for malpractice, negligent misrepresentation, breach of fiduciary duty, and breach of contract.  As explained herein, plaintiffs have proffered evidence that they would not have proceeded with the transaction

---

[1]Defendants have also advanced several other arguments in favor of summary judgment, which the court need not address in this order.

if not for Callahan's allegedly wrongful conduct--in other words, that Callahan's conduct was a "but-for" cause of their loss.  But they have not produced competent evidence creating a genuine issue of fact as to whether his conduct was the legal and proximate cause of that loss.

The court denies defendants' motion, however, as to plaintiffs' Consumer Protection Act claim.  Plaintiffs need not show that Callahan's conduct caused their loss to recover under the Act, and, contrary to defendants' argument, the "securities regulation" exemption to the Act does not apply here.  As for plaintiffs' motions for default judgment, the court does not believe that defendants' conduct, though potentially worthy of some sanction, is deserving of the harsh sanction plaintiffs have proposed.  Those motions are therefore denied.

## I.   <u>Applicable legal standard</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial.  <u>See</u> Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010) (citing Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009)).  A fact is "material" if it could sway the outcome under applicable law.

Id. (citing Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving party."  Id.  But the court need not credit "conclusory allegations, improbable inferences, or unsupported speculation."  Meuser, 564 F.3d at 515 (quotation omitted).  The following facts are set forth accordingly.

## II.  **Background**

In 1986, Ron Elmo and Scott Schimpf founded Guardian Fire Equipment as an Emergency One (or "E-One") dealership for Eastern Pennsylvania and Southern New Jersey.  Guardian acquired a Hurst dealership in that same territory in 1989.  E-One manufactures fire trucks, while Hurst manufactures the "Jaws of Life" and other emergency-related equipment. Both E-One and Hurst distribute their products through a network of exclusive dealers. By 2007, Guardian had grown to encompass two physical facilities, employing around 25 to 31 people in total, including a sizeable service department.

In 2006, former defendant Steve Lawrence approached Elmo and Schimpf about selling Guardian's assets to an acquiring entity as part of a so-called "roll-up" merger of several emergency services equipment dealers.  The resulting company--Emergency Resources Incorporated, or "ERI"--would, in theory, have greater

4

"critical mass" and be better positioned to compete in the marketplace.

Elmo and Schimpf were receptive to the idea.  In May 2006, they met with Lawrence and a representative of the Havens Group, the expected purchaser in the roll-up, in Baltimore.  Several other potential sellers also attended.  After the meeting, Elmo and Schimpf retained Lawrence's company, Rosecliff Partners, LLC, to represent Guardian in the sale.

In June 2006, two of the sellers who had attended the meeting in Baltimore sent a memorandum to other potential sellers, including plaintiffs, regarding the "merits of using a common attorney for the process of a group purchase."  These sellers mentioned they had successfully utilized this practice in an earlier transaction, "thereby saving money and avoiding the pitfalls of using attorneys inexperienced in such transactions." They recommended that the other sellers, including plaintiffs, engage the attorney whose services they had used in the former transaction, defendant James Callahan (who had also represented Lawrence previously).  They continued:  "you are welcome to discuss any concerns you have with Steve Lawrence as Steve has also utilized Mr. Callahan.  However, keep in mind that this attorney is intended to represent us, not Steve or the Havens Group so this is technically not Steve's issue."

Following this recommendation, plaintiffs reached out to Callahan.  On June 19, 2006, Callahan sent Schimpf an engagement letter.  The letter stated, in relevant part:

> Thank you for engaging me in this matter.  I would be happy to represent your company regarding your contemplated sale of substantially all of your company's assets to The Havens Group, or its nominee, although it is important to outline the scope of services prior to undertaking any work.
>
> As has been previously explained by Steve Lawrence, I would serve as special counsel, with the engagement limited to this contemplated transaction.  In this capacity, I would serve as legal counsel and liaison between not only your company, but also each of the other companies that intend to sell to Havens.  As part of this process, I will assist with:  (i) the negotiation and execution of a Letter of Intent; (ii) the negotiation and execution of a definitive purchase agreement; and (iii) assistance with the closing. . . .
>
> On another matter, I need to disclose, and request your assent and acknowledgment, that, as you know, I am also serving as special counsel to other selling companies involved in this transaction.  I also previously represented Rosecliff Partners, LLC, and Steve Lawrence.

Elmo and Schimpf chose to retain Callahan as their counsel for Guardian's sale, and Schimpf signed Callahan's engagement letter.[2]  Neither Elmo nor Schimpf had ever been involved in a transaction of the size and complexity of the proposed sale.

---

[2]At this time, Callahan was employed as an attorney with defendant Brighton, Runyon & Callahan.  In July 2007, Callahan left Brighton, Runyon & Callahan and joined defendant Bowditch & Dewey.  He continued to represent the plaintiffs (and, as will be discussed shortly, Lawrence and his company) after joining Bowditch & Dewey.

They looked to Callahan for counsel on all aspects of the sale because of his training and his supposed expertise on such deals.

After retaining Callahan, Elmo and Schimpf executed a letter of intent to sell Guardian to the Havens Group for "a price in the vicinity of $5.6 million in cash."  Plaintiffs claim that this agreement did not permit Elmo and Schimpf to share Guardian's financial information or the terms of their deal with any other potential sellers, and likewise did not permit them to examine the financial information of other sellers.[3]  They further assert that this aspect of the agreement was unfavorable to them because it kept them from understanding the business operations of entities that would become a part of the company purchasing their business.  Callahan did not so advise them, plaintiffs say, although an attorney in his position should have done so.

---

[3]None of the parties submitted the letter of intent to this court with their summary judgment materials, although plaintiffs relied upon it in their opposition to defendants' motion.  The court therefore ordered plaintiffs to submit an authenticated copy of the letter of intent, see Order of Aug. 13, 2012, which they did.  After studying the letter of intent, the court is at a loss to see how it conceivably prohibits Elmo and Schimpf from viewing other sellers' financial information (or, for that matter, from sharing Guardian's financial information with other sellers).  Nonetheless, because defendants have not challenged plaintiffs' account and because it makes no difference to the court's resolution of the defendants' motion, the court accepts that account as true.

Citicorp had expressed an interest in funding the proposed transaction.  The Havens Group, however, was unwilling to advance the fees Citicorp demanded to cover its due diligence analysis. Ultimately, the transaction initially envisioned--a roll-up purchase by the Havens Group--did not proceed to fruition. Instead, Lawrence himself resolved to form a separate company, S3 Sentinel Safety Supply, Inc., to acquire the assets of the various emergency services equipment dealers involved in the roll-up.  This acquisition was to be funded by Wachovia Bank.

In early 2007, Callahan (while still representing Elmo and Schimpf) agreed to represent Lawrence and S3 in connection with the roll-up.  In an engagement letter dated January 10, 2007 (but which Callahan admitted preparing at some later date and backdating), Callahan and Lawrence confirmed that Callahan would represent S3 "regarding the acquisition of the assets of various emergency services sales and distribution companies as well as taking the holding company through the financing process." Lawrence agreed that S3 would pay Callahan $110,000 for his services, "contingent upon the transaction contemplated by this representation obtaining financing and closing."  And, in a separate letter to Lawrence bearing the same date (but which, again, Callahan prepared later and backdated), Callahan wrote:

> Thank you for allowing me to assist you in the
> consolidation of various emergency services sales,

> service and distribution companies once again.  The
> purpose of this letter is to confirm that, in addition
> to any legal work I do in connection with this
> endeavor, I (and several of my associates) will be paid
> the lesser of one (1%) percent of any amount financed
> through Wachovia Bank or $100,000 at closing.  If this
> transaction does not close, no fee shall be due.

Callahan continued to represent the plaintiffs while representing S3.  He did not tell the plaintiffs that he also represented S3, or that he stood to make as much as $210,000 if the sale to S3 went through.  While representing both S3 and the plaintiffs, Callahan coordinated the transfer of assets into S3 and prepared the transaction documents.  The proposed S3 transaction was to be more like a leveraged buyout than a roll-up merger.  The plaintiffs, rather than receiving just cash in consideration for their sale, would receive a portion of the purchase price in cash, and the remainder in subordinated debt and equity in S3.  In several discussions with Callahan and others, the plaintiffs were told that the stock they would acquire from S3 would likely be more valuable than cash because S3 would be more valuable than the individual companies comprising it.  The plaintiffs themselves were unable to confirm this, because they were still bound by the claimed restriction

that prevented them from viewing the other sellers' financial information.  <u>See</u> n.3 and accompanying text, <u>supra</u>.[4]

On September 11, 2007, the plaintiffs entered into an asset purchase agreement with S3.  Under the agreement, Guardian (which plaintiffs' expert has valued at $4.3 million at that point in time) sold its assets for $3.1 million, comprised of approximately $1.3 million in cash (funded by a loan from Wachovia) and approximately $1.8 million in promissory notes and stock issued to Elmo and Schimpf.  Several of the other sellers received more advantageous terms than Elmo and Schimpf (i.e., a greater percentage of the selling price in cash), which Elmo and Schimpf did not know, again, they say, due to the claimed restriction on knowing the terms of the other sellers' deals.  Callahan, although he was aware of the terms that other sellers received, did not inform Elmo and Schimpf of those terms.

Within one or two months of the transaction's closing, it became clear that S3 was not meeting its debts as they came due.  S3 collapsed shortly thereafter, and the notes and paper the plaintiffs acquired in the transaction were, therefore, worthless.  Elmo and Schimpf used the remaining cash proceeds

---

[4]It is not clear, and plaintiffs do not explain, how this restriction--supposedly a term of the plaintiffs' letter of intent with the Havens Group--could have extended to the S3 transaction.  Again, however, defendants have not questioned plaintiffs' assertions.

from the sale to reacquire some of Guardian's tangible assets from Wachovia, and attempted to reestablish their business.  That attempt was unsuccessful, and Guardian was eventually liquidated.

The plaintiffs' experts have opined that Callahan's representation of the plaintiffs failed to meet the expected standard of care in a number of ways.  Those ways include:

- Representing S3 after proposing to represent the plaintiffs;

- Not disclosing to the plaintiffs the nature and possible consequences of his conflicts of interest;

- Not disclosing his significant economic stake in the transaction[5];

- Not advising the plaintiffs that the supposed contractual restriction against examining other sellers' finances was not in their best interests and posed significant risks to them;

- Not advising the plaintiffs about the risks associated with receiving subordinated debt and equity in exchange for their business as opposed to receiving cash;

- Not advising the plaintiffs that the S3 transaction involved an issuance of securities and thus needed to be registered with the New Hampshire Bureau of Securities Regulation; and

- Not advising the plaintiffs of the different and more advantageous terms other sellers received, and failing to obtain those same terms for the plaintiffs.[6]

---

[5]In addition to the fee agreement with Lawrence outlined above, Callahan received 6% of S3's stock in the transaction.

[6]Plaintiffs' experts also opine that Callahan failed to meet the standard of care in a number of other ways.  They opine, for example, that Callahan neither advised appropriate due diligence "in light of some of the concerns raised by Wachovia leading up to the closing" nor advised plaintiffs of the significance of a

Elmo claims that if not for Callahan's alleged breaches of the duty of care, he and Schimpf would have conducted themselves differently.  Specifically, Elmo claims that:

- Had they known that Callahan was representing S3 and had a significant financial stake in the transaction, he and Schimpf "would have had legitimate concerns about Attorney Callahan's loyalty to us as his clients" and "would not have trusted his advice and counsel";

- Had he and Schimpf known that other sellers were receiving more favorable terms, they would not have proceeded with the transaction; and

- Had he and Schimpf known about the financial condition of the other sellers, they would not have proceeded with the transaction.

In addition, one of plaintiffs' experts opines that had the transaction been registered with the Bureau of Securities Regulation, the resulting process would have taken three to six months.[7]  Elmo further claims that, had the transaction been

---

certain "Wells Fargo requirement."  These (and several other) opinions as to Callahan's breaches of the standard of care are not supported by evidence in the record before the court.  There is, for example, no evidence about the supposed "concerns raised by Wachovia leading up to the closing" or the reputed "Wells Fargo requirement" the plaintiffs' experts reference.  The court therefore does not consider the experts' opinions as to these other claimed breaches.

[7]That same expert has also opined that "[i]t is extremely unlikely that the S3 Transaction would have been approved and funded for closure" had it been registered.  The first time that expert expressed such an opinion, however, was in an affidavit submitted in opposition to defendants' summary judgment motion. He did not disclose that opinion in his initial Rule 26(a)(2)(B) report, nor did he disclose it in his later supplementation of that report.  Federal Rule of Civil Procedure 37(c)(1) provides

delayed three to six months, he and Schimpf "likely would have backed out of the deal."

## III.  <u>Analysis</u>

### A.  **Defendants' motion for summary judgment**

Defendants argue that, while plaintiffs' evidence may establish that Callahan's alleged misconduct was a "but-for" cause of plaintiffs' loss, the plaintiffs have no evidence that it was a legal, or proximate, cause of that loss.  As a result, they say, they are entitled to summary judgment on all of plaintiffs' claims.  The court agrees with defendants' view of the evidence, and agrees in part with their view of the law:  for the majority of plaintiffs' claims, the lack of proximate causation is fatal.  The court therefore grants summary judgment to defendants on plaintiffs' claims for malpractice, negligent misrepresentation, breach of fiduciary duty, and breach of contract.[8]

---

that a party's failure to provide information required by Rule 26(a), unless "substantially justified or . . . harmless," precludes that party from using that information at trial.  As plaintiffs have neither sought to justify their failure to disclose this opinion nor argued that failure was harmless, the court grants defendants' motion to exclude the opinion (document no. 104).  See Harriman v. Hancock Cnty., 627 F.3d 22, 29-32 (1st Cir. 2010).

[8]The court acknowledges that the label "proximate cause" is most typically applied to tort, rather than contract, claims. But, as the United States Supreme Court has explained,

Under the Consumer Protection Act, however, plaintiffs may still recover statutory damages even if they are incapable of demonstrating that they suffered injury as a result of Callahan's conduct.  Forrester Envtl. Servs., Inc. V. Wheelabrator Techs., Inc., 2012 DNH 139, 19-22 .  Although defendants also argue that plaintiffs' Consumer Protection Act claim must fail because Callahan's conduct falls within one of the exemptions to the Act, the court does not agree.  Defendants' motion for summary judgment is therefore denied as to that claim.

### 1.   *Proximate causation*

"The courts do not reward one for being wronged, but act only to compensate and to prevent loss."  Record v. Rochester Trust Co., 89 N.H. 1, 183 (1937).  Plaintiffs cannot recover for

---

"[a]lthough the principles of legal causation sometimes receive labels in contract analysis different from the 'proximate causation' label most frequently employed in tort analysis, these principles nevertheless restrict liability in contract as well." Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 839-40 (1996). The touchstone for proximate causation in tort cases is whether the defendant could have reasonably foreseen the plaintiff's injury, Goss v. State, 142 N.H. 915, 917 (1998); and recovery in contract likewise lies only if the plaintiff's injury was reasonably foreseeable, Indep. Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 138 N.H. 110, 113-14 (1993) (referring to this principle as "proximate cause").  Indeed, "[t]he scope of foreseeability with respect to damages is narrower in contract cases than in tort cases." Salem Eng'g & Constr. Corp. v. Londonderry Sch. Dist., 122 N.H. 379, 384 (1982).  In any event, plaintiffs have not argued that the requirement of proximate cause is inapplicable to their breach of contract claim, or that the proximate cause analysis for that claim differs in any way from the analysis that applies to their other claims.

legal malpractice, negligent misrepresentation, breach of
fiduciary duty, and breach of contract simply by showing that
Callahan wronged them (which, if their account is accepted, he
plainly has); rather, they must demonstrate that they suffered
some loss caused by his conduct.  See Estate of Sicotte v. Lubin
& Meyer, P.C., 157 N.H. 670, 674 (2008) ("[A] plaintiff in a
legal malpractice action must prove resultant harm legally caused
by the breach."); Mullen v. Kalil, 2008 DNH 137, 12-14 (plaintiff
must prove damages caused by breach to recover for breach of
fiduciary duty); Indep. Mech. Contractors, 138 N.H. at 113-14
(plaintiff in breach of contract action must show reasonably
foreseeable damages caused by breach); DiPerri v. Tothill, 129
N.H. 676, 679-80 (1987) (negligent misrepresentation plaintiff
must establish "causal connection between the asserted
misrepresentations and the harm which ultimately occurred").

     "Causation focuses on the mechanical sequence of events,"
and "involves both cause-in-fact and legal cause."  Carignan v.
N.H. Int'l Speedway, Inc., 151 N.H. 409, 414 (2004).  "Cause-in-
fact requires the plaintiff to show that the injury would not
have occurred but for the [defendant's] conduct," while "legal
cause requires the plaintiff to establish that the [defendant's]
conduct was a substantial factor in bringing about the harm."
Id.  "Ultimately, resolution of the question of proximate cause

is generally for the trier of fact." Beckles v. Madden, 160 N.H.
118, 125 (2010).  Nonetheless, summary judgment may be entered in
the defendant's favor where the plaintiff has not presented
evidence creating a genuine dispute of material fact as to
proximate cause.  See, e.g., Goss, 142 N.H. at 917; Manchenton v.
Auto Leasing Corp., 135 N.H. 298, 305-06 (1992).

    Plaintiffs have undoubtedly proffered evidence establishing
that Callahan's conduct was a cause-in-fact of their loss.  If
not for that conduct, they say, they very likely would not have
proceeded with the transaction.  And had they not proceeded with
the transaction, they would not have ended up with $1.8 million
in worthless promissory notes from S3.

    But plaintiffs have not come forward with any evidence
creating a genuine issue of material fact as to whether any of
Callahan's conduct was a substantial factor in bringing about
their loss.  To establish legal cause, a plaintiff must show that
his or her injury was a foreseeable consequence of the
defendant's conduct.  Goss, 142 N.H. at 917; see also Salem Eng'g
& Constr., 122 N.H. at 383-84.  Plaintiffs have, quite simply,
not proffered any admissible evidence from which a reasonable
jury could conclude that Callahan's conduct--whether it be
characterized as malpractice, misrepresentation, breach of
fiduciary duty, or breach of contract--could foreseeably have

16

resulted in their loss.  That loss occurred when S3, within weeks
of the sale, found itself unable to pay its debts and collapsed,
leaving plaintiffs unable to collect on their promissory notes.
But plaintiffs have presented no evidence as to why S3 collapsed,
let alone any evidence that S3's collapse or the reasons for it
should have been foreseeable to Callahan.[9]

Plaintiffs do speculate that S3 failed because "several of
the sellers did not have the accounts receivable and other assets
they were paid for at closing" and "several also had accounts
payable that were substantially more than expected."  In support
of these asseverations, plaintiffs have proffered an affidavit
from Elmo claiming that "[o]ver time I learned that the major
cause of [S3's] shortfall was that several of the sellers failed
to provide the accounts receivable and other assets they were
paid for at closing."  But the affidavit, which plaintiffs'
counsel conceded at oral argument was the only evidence in the
record as to why S3 failed, does not provide a proper foundation

---

[9]Defendants argue that plaintiffs must present expert
testimony to establish proximate cause in this action, and note
that plaintiffs' experts have testified to having no opinions on
the cause of plaintiffs' loss.  It is true that expert testimony
may be required for this purpose in certain types of legal
malpractice actions.  See, e.g., Estate of Sicotte v. Lubin &
Meyer, 157 N.H. 670, 674 (2008).  The court is not entirely
persuaded that it is necessary in the present case, but need not
address that issue because there is no evidence whatsoever
(expert testimony or otherwise) that Callahan's conduct legally
caused plaintiffs' loss.

for this testimony.  It does not explain how Elmo could possibly have learned this information, apart from references to (1) a single site visit at another seller's facility (which may have enabled Elmo to learn about one, but not "several of," the sellers, let alone any link between their supposed financial weakness and S3's failure); and (2) a memorandum prepared by a Wachovia employee (which plaintiffs have failed to provide to the court even though "[a]n original writing" or unquestioned duplicate is typically "required in order to prove its content" under Federal Rules of Evidence 1002 and 1003, and which is, in any event, hearsay that would not seem to fall within any exemption or exception).  The court cannot, therefore, credit this evidence on summary judgment.  See, e.g., Gómez-González v. Rural Opportunities, Inc., 626 F.3d 654, 666 (1st Cir. 2010) (court may not consider inadmissible material in ruling on summary judgment motion).

If plaintiffs had presented admissible evidence that S3 failed because the other sellers were in fact undercapitalized, as plaintiffs claim, this might be a very different case.  In that event, a jury could arguably conclude that (for example) Callahan's failure to counsel plaintiffs on the risks attendant to their contractual restriction on viewing other sellers' finances legally caused plaintiffs' loss.  This is because in

such a situation, one could attribute plaintiffs' loss to the
very risk a reasonable attorney would have foreseen as a possible
consequence of Callahan's alleged breach--namely, that the other
merger targets did not have the assets they claimed to have.  But
the court need not ruminate further on this hypothetical
scenario, because, as noted, plaintiffs have not come forward
with any evidence as to the reasons S3 failed.  Based upon the
record before the court, it is pure speculation to assume that S3
failed due to the other sellers' weak financial condition, as
opposed to integration problems among the target companies,
mismanagement after closing, or any one of the other myriad
reasons that businesses fail, and which an attorney in Callahan's
position could not have reasonably foreseen as the consequence of
his alleged conduct.

    Plaintiffs seek to deflect this blow by arguing that "the
exact pathology of S3's failure" is irrelevant.  (Indeed,
plaintiffs are so certain that the reasons S3 failed are
irrelevant that they have moved to exclude any evidence of those
reasons.  See document no. 92.)  The key here, they say, is "that
a competent attorney, acting consistent with his fiduciary
duties, would . . . have advised their *[sic]* clients about the
likely risks of the transaction and as to the steps they should
have taken to protect against the harms that ultimately brought

19

S3 down."  But this just begs the question:  <u>which</u> harms
"ultimately brought S3 down"?  And, more precisely, are those the
same harms the plaintiffs could have avoided if not for
Callahan's conduct?  On the present record, it is impossible to
answer these questions, and thus impossible for a rational jury
to conclude that, had Callahan competently represented the
plaintiffs, they could have avoided those harms.

Plaintiffs also seek to escape their obligation to prove
legal causation entirely, arguing that in a transactional
malpractice case like this one, "the plaintiff must show that but
for the attorney's negligence he would have walked away from the
deal and that as a result of walking away he would have been in a
better economic position than he was in fact under the terms of
the deal as actually completed."  In support of this view, they
rely upon a number of extrajurisdictional cases.  Assuming,
<u>arguendo</u>, that New Hampshire law is in concordance with the law
explicated in those cases, plaintiffs nonetheless misread them.
In each of the cited cases, the only type of causation at issue
was cause-in-fact, or "but-for" causation.  <u>See</u>, <u>e.g.</u>, <u>Ludlow v.
Gibbons</u>, No. 10CA1719, 2011 WL 5436481, *4 (Colo. App. Nov. 10,
2011) ("The element of causation in a negligence case--often
referred to as proximate cause--has two aspects:  causation in
fact (which is at issue here) and legal causation (which is

20

not).”); Viner v. Sweet, 70 P.3d 1046, 1048 n.1 (Cal. 2003)
(“Causation analysis in tort law generally proceeds in two
stages:  determining cause in fact and considering various policy
factors that may preclude imposition of liability. . . .  This
case concerns only the element of cause in fact.”); see also
Mosman v. Lindquist & Vennum, P.L.L.P., No. A06-2418, 2008 WL
467420, *2-4 (Minn. Ct. App. Feb. 12, 2008); Smith v. Preston
Gates Ellis, LLP, 147 P.3d 600, 602-03 (Wash. Ct. App. 2006);
Jerry’s Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.,
711 N.W.2d 811, 819-20 (Minn. 2006); Viner v. Sweet, 12 Cal.
Rptr. 3d 533, 537-38 (Cal. Ct. App. 2004).  Each of the cases
also recognized that, in addition to cause-in-fact, the plaintiff
bore the burden of establishing legal causation.  Because only
cause-in-fact was at issue, though, the courts’ opinions in those
cases shed no light on what evidence is required to prove legal
causation.

Those courts certainly did not, as plaintiffs suggest,
essentially merge cause-in-fact and legal causation into a single
analysis that permits the plaintiff to recover simply by claiming
that without the malpractice, he would have walked away from a
transaction he later has cause to regret.  Were the court to
accept plaintiffs’ argument, it would essentially turn all
transactional attorneys into guarantors of their clients’

financial success.  A client who makes a deal that later results

in a loss could run to court asserting he never would have done

the deal if not for his attorney's conduct, and thereby seek to

shift the financial burden of the bad deal to his attorney

without regard to whether the catalyst for the loss was something

a reasonable attorney would have foreseen.  The court knows of no

case, in New Hampshire or elsewhere, that has adopted so generous

a causation standard for malpractice, misrepresentation, breach

of fiduciary duty, or breach of contract claims.[10]

--------------------------------------------------

[10]At oral argument, plaintiffs' counsel articulated what
appears to be a new theory of damages and causation:  plaintiffs'
deal was bad for them from the very outset, because they received
only about $3 million for a company worth in excess of $4
million, and over half of that $3 million was worthless paper.
The court normally ignores theories that are raised for the first
time at oral argument, see Doe v. Friendfinder, Inc., 540 F.
Supp. 2d 288, 304 n.19 (D.N.H. 2008), and, in any event, this
theory is also without merit.  To begin, there is no evidence
that the subordinated debt and equity plaintiffs received from S3
was "worthless" from the outset; to the contrary, the evidence
suggests that it became worthless later when S3 failed for
unknown reasons.  More fundamentally, plaintiffs believed at the
time of the deal that $3 million was a fair price for their
company, and there is no evidence that Callahan's conduct somehow
affected the price they accepted (indeed, plaintiffs conceded at
oral argument that Callahan placed no role in negotiating the
sale price).  That plaintiffs now regret their deal and believe
they could have gotten an even better price for the company
elsewhere does not make defendants liable simply because
plaintiffs would not have done the deal if not for Callahan's
misconduct, at least not in the absence of any evidence that the
lower price was a foreseeable consequence of that misconduct.
Again, plaintiffs' position would permit any represented party
that later experiences seller's remorse to shift the burden of
its bad decision to its attorney without regard to the
foreseeability of that party's loss.

For the foregoing reasons, the court grants summary judgment to defendants on plaintiffs' claims for malpractice, negligent misrepresentation, breach of fiduciary duty, and breach of contract.  Plaintiffs' failure to present evidence of a causal link between Callahan's alleged conduct and their losses does not, however, prevent them from recovering under the Consumer Protection Act ("CPA").  Although, as this court has previously noted, the CPA's "plain language . . . would seem to mandate that only 'persons injured' by an unlawful act or practice may bring suit," Forrester, 2012 DNH 139 at 19 (quoting N.H. Rev. Stat. Ann. § 358-A:10, I) (internal quotations and alteration omitted), the New Hampshire Supreme Court has held to the contrary, and has interpreted the CPA to permit plaintiffs to recover statutory damages even in the absence of an injury legally caused by the defendant, see Beckstead v. Nadeau, 155 N.H. 615, 620-21 (2007).

---

As a further aside, the court notes that Callahan's failure to obtain the same advantageous terms for plaintiffs that other sellers received arguably caused plaintiffs some harm:  because plaintiffs received a greater percentage of their selling price in notes from S3, they lost proportionally more than those sellers when S3 failed.  On this theory, plaintiffs could at least recover the difference between what they actually lost and what they would have lost had Callahan obtained better sale terms for them.  But plaintiffs have never pursued this theory of recovery, and conceded at oral argument that their only theory of recovery was that they would not have done the deal at all if not for Callahan's misconduct.  The court therefore has not considered this alternative theory of recovery here.

It is therefore necessary to address defendants' alternative argument for summary judgment on the plaintiffs' CPA claim.

### 2. *Consumer Protection Act*

Under the CPA, it is "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. Ann. 358-A:2.  Not all unfair or deceptive acts and practices fall within the scope of the CPA; the statute exempts several types of transactions, including:

> Trade or commerce that is subject to the jurisdiction of the bank commissioner, the director of securities regulation, the insurance commissioner, the public utilities commission, the financial institutions and insurance regulators of other states, or federal banking or securities regulators who possess the authority to regulate unfair or deceptive trade practices.

Id. § 358-A:3, I (emphasis added).  Defendants argue that because all of Callahan's alleged actions "were made in connection with" a transaction that involved the sale of securities, those actions are "subject to the jurisdiction of" the director of securities regulation (the "director"), and this provision serves to bar plaintiffs' CPA claim.  The court cannot agree.

"[T]o determine when offering for sale or distributing a service is 'subject to the jurisdiction of' the [director]," this court must "examine the statutes that define the [director's] powers and authority." Rainville v. Lakes Region Water Co.,

Inc., 163 N.H. 271, 275 (2012).  If those statutes grant the director the authority to supervise or regulate the trade or commerce in which the defendants' deceptive practice occurred, then that trade or commerce is "subject to the jurisdiction of" the director, and the CPA does not apply.  Id. at 275-76; New Hampshire v. Empire Auto. Group, Inc., 163 N.H. 144, 146 (2011).

New Hampshire's Uniform Securities Act grants the director the authority "to administer the provisions of" the Act.  N.H. Rev. Stat. Ann. § 421-B:21, I.  Among other things, the director has the authority to police unlawful activities, such as fraudulent and deceptive conduct, committed "in connection with the offer, sale, or purchase of any security," id. §§ 421-B:3-5, to oversee the licensing and monitoring of securities brokers and investment advisors, id. §§ 421-B:6-10, and to oversee securities registrations and disclosures, id. §§ 421-B:11-20.  In short, the director's jurisdiction extends broadly over the issuance, offer, and sale of securities.

The defendants' alleged unfair and deceptive conduct, however, did not occur in the course of the issuance, offer, or sale of securities.  The trade or commerce in which defendants' conduct occurred was the practice of law; specifically, their representation of the plaintiffs in the S3 transaction.  It was in the course of that representation, and not in the issuance or

sale of securities, that Callahan concealed his conflict of interest and financial stake in the closing from plaintiffs.  It was in the course of that representation, and not in the issuance or sale of securities, that Callahan failed to properly advise plaintiffs and to conduct himself as a reasonable fiduciary would have done under the circumstances (possibly due to that conflict and stake in the closing).

That the underlying transaction ultimately involved the issuance of securities by S3 to plaintiffs is of no moment.  The New Hampshire Supreme Court's opinion in Empire Automotive Group is instructive.  There, the defendant, which was licensed by the state banking department as a seller of motor vehicles subject to retail installment sale contracts, allegedly violated the CPA by placing inspection stickers on two cars, sold under installment sales contracts, that had not passed inspection.  Empire Auto. Group, 163 N.H. at 145.  The defendant moved to dismiss, arguing that because its conduct involved the sale of motor vehicles subject to retail installment sale contracts, that conduct fell within the jurisdiction of the banking department and was thus exempt from the CPA.  Id.  The trial court denied the motion, and the Supreme Court affirmed, reasoning that "the fact that the two motor vehicles in question may have been sold under retail installment contracts has nothing whatsoever to do with the

26

fraudulent conduct." Id. at 146.  That conduct had "nothing at
all to do with the financing of the vehicles," and "would clearly
violate the CPA regardless of whether the vehicles were sold
under a retail installment contract [or] for cash." Id.

So, too, the fact that the transaction in question here may
have involved the issuance of securities "has nothing whatsoever
to do with the fraudulent conduct."  Callahan's conduct had
"nothing at all to do with" the issuance of the securities, and
the fact that plaintiffs received securities as part of their
remuneration, rather than cash alone as was originally
envisioned, did not affect the nature of his conduct.  The New
Hampshire Supreme Court's opinion in Rainville is not to the
contrary.  Rainville simply stands for the proposition that in
determining whether the exemption applies, "[t]he issue is not
whether a party's deceptive practice is subject to the
[director's] jurisdiction, but whether the practice occurred in
the conduct of 'trade or commerce' that is subject to the
[director's] jurisdiction." 163 N.H. at 276 (emphasis in
original).  And, as just discussed, defendants' allegedly
deceptive practices occurred while practicing law, not while
offering, selling, or purchasing securities.

The director inarguably lacks the authority to supervise or
regulate the practice of law.  Because that particular trade or

commerce is not subject to the director's jurisdiction, the CPA exemption set forth in N.H. Rev. Stat. Ann. § 358-A:3, I does not apply.[11]  Defendants' motion is denied as to the CPA claim.

**B.   Plaintiffs' motions for default judgment**

Plaintiffs have moved for default judgment against defendants, arguing that defendants failed to take the steps necessary to preserve critical evidence after learning of the possibility of litigation.  The motions are primarily based upon defendants' failure to preserve electronic copies of the two January 10, 2007 letters from Callahan to Steve Lawrence described in Part II, <u>supra</u>.[12]  Callahan admitted in deposition

_____

[11]A previous version of N.H. Rev. Stat. Ann. § 358-A:3, I exempted "[t]rade or commerce otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of this state or of the United States" from the CPA.  The New Hampshire Supreme Court interpreted this language to exempt the practice of law from the CPA.  Averill v. Cox, 145 N.H. 328, 330-35 (2000).  In 2002, the legislature amended the statute, and its current language would seem to allow no exemption for the practice of law.  In an earlier dispositive motion, defendants argued that the amendment did not, in fact, affect that exemption.  <u>See</u> Mot. for Judgment on the Pleadings (document no. 42) at 3-5.  Although the court denied that motion without prejudice to defendants renewing their argument at summary judgment, <u>see</u> Order of May 2, 2012, defendants have chosen not to reassert the argument, so the court does not address it here.

[12]In a supplemental motion for default judgment, plaintiffs also focus on other documents that defendants supposedly failed to preserve, including a January 9, 2007 memorandum Callahan claims he prepared in connection with his work on the S3 transaction, Callahan's e-mail correspondence with another

testimony that he did not actually prepare the letters in January
2007, but "later on in the spring or maybe the summer."
Plaintiffs speculate that Callahan may have prepared the letters
as much as a year later--in April or May 2008--in order to
justify the fees he had received in connection with the S3
transaction.  But plaintiffs cannot tell when the letters were
prepared, because any electronic copies of the letters, including
metadata indicating the documents' dates of creation, were
destroyed when the hard drive of one of Callahan's computers
crashed in early 2008 and the hard drive of Callahan's
replacement computer was destroyed as a part of a routine upgrade
of Bowditch & Dewey's computers in May 2010.

Plaintiffs say that the hard drives were destroyed after
Callahan first learned or had reason to know that litigation over
S3's failure (and his role in it) was likely.  Had Callahan or
the other defendants observed proper evidence preservation
practices, plaintiffs say, they would have issued litigation
holds and either not destroyed Callahan's hard drives or made
images of those drives before their destruction.  Because

---

Bowditch & Dewey partner regarding the transaction, and
Callahan's billing records.  Defendants say that since plaintiffs
filed their motion, defendants have produced all of Callahan's
billing records for the relevant period to plaintiffs, which
plaintiffs did not dispute at oral argument.  As for the other
categories of documents, the analysis herein takes those
documents into account as well.

defendants did not do so, the contents of those hard drives were
lost.  Plaintiffs suggest that default judgment is an appropriate
sanction for defendants' failure to preserve the hard drives.

The court assumes for the sake of argument that, before the
hard drives were destroyed, defendants had reason to believe that
(a) litigation was likely and (b) the hard drives in question
contained relevant evidence.[13]  As such, they were under a duty
to take steps to preserve the evidence found on those hard
drives.  See Treppel v. Biovail Corp., 249 F.R.D. 111, 118
(S.D.N.Y. 2008) ("[O]nce a party reasonably anticipates
litigation, it must suspend its routine document
retention/destruction policy and put in place a 'litigation hold'
to ensure the preservation of relevant documents.").  It is
undisputed that defendants failed to take such steps:  they did
not implement a litigation hold until late 2011, and did not
electronically image either of Callahan's computers before the

---

[13]For the reasons detailed in defendants' memorandum in
opposition to plaintiffs' motion, there is good reason to doubt
the first of these propositions as to the first hard drive, and
the second of these propositions as to the second drive.  The
burden of proof lies with the party seeking the sanction, see
Phinney v. Paulshock, 181 F.R.D. 185, 197 (D.N.H. 1998), and the
court would have serious reservations concluding that plaintiffs
carried their burden with respect to these propositions.  But the
court need not examine that issue in detail because plaintiffs'
motion is denied on alternate grounds.

hard drives were destroyed.  The question, then, is whether default is an appropriate sanction for these shortcomings.

"[F]ederal law favors the disposition of cases on the merits, and, as a result, a default judgment is a drastic sanction that should be employed only in an extreme situation." Stewart v. Astrue, 552 F.3d 26, 28 (1st Cir. 2009).  That sanction may be appropriate in cases where a party has lied to the court, repeatedly violated court orders, and committed willful discovery misconduct.  Global NAPs, Inc. v. Verizon New England, Inc., 603 F.3d 71, 93-94 (1st Cir. 2010); see also Remexcel Managerial Consultants, Inc. v. Arlequin, 583 F.3d 45, 51-52 (1st Cir. 2009).  But such circumstances will not automatically warrant default, as "[t]he appropriateness of a default sanction must be evaluated on a case by case basis." Hooper-Haas v. Ziegler Holdings, LLC, — F.3d —, 2012 WL 3242002, *3 (1st Cir. Aug. 10, 2012).

> Relevant factors include, but are not limited to, the nature of the misconduct, its repetition (or lack thereof), its degree of deliberateness, the extent to which the offender had fair warning of the possible consequences of misconduct, the availability vel non of an opportunity to offer mitigating circumstances, the presence or absence of prejudice to the other party, the degree of interference with the functioning of the court, and the adequacy of lesser sanctions.

Id.  In addition, the court must keep in mind the goals of sanctions:  "to penalize wrongful conduct and to deter future

similar conduct by the particular party and others who might be tempted to such conduct in the absence of such a deterrent." Companion Health Servs., Inc. v. Kurtz, 675 F.3d 75, 84 (1st Cir. 2012).

The court agrees with plaintiffs that "[l]itigants (especially when they are lawyers) who act intentionally or with willful disregard to subvert their opponents' ability to find and offer relevant evidence" should face harsh sanctions--perhaps even default.  But, despite plaintiffs' fanciful characterization of the circumstances surrounding the hard drives' destruction, the loss of any documents housed on Callahan's hard drives does not appear to have been an intentional or willful action designed to "subvert" plaintiffs' case.  At worst, that conduct appears to have been the result of gross negligence coupled with hopelessly poor observance of standard litigation practices.  This type of conduct is especially worrisome because defendants are attorneys who should know better.  But the fact that defendants' destruction of potentially relevant evidence was apparently unintentional weighs heavily in the court's analysis.[14]  Compare Velazquez-Rivera v. Sea-Land Serv., Inc., 920 F.2d 1072, 1076-77

---

[14]To the extent that plaintiffs attempt in their motions to paint defendants' responses to their discovery requests as a bad-faith attempt to conceal the destruction of Callahan's hard drives, the court does not share their view of those responses.

(1st Cir. 1990) (reversing district court's dismissal of case where plaintiffs' failure to comply with court orders where plaintiffs's conduct did not arise from deliberate delay or neglect, or willful disobedience of the court's orders) with Affanato v. Merrill Bros., 547 F.2d 138, 141 (1st Cir. 1977) (affirming default judgment where defendant's conduct "went well beyond ordinary negligence" and "consisted of a series of episodes of nonfeasance which amounted, in sum, to a near total dereliction of professional responsibility").

Also bearing on the inappropriateness of default as a sanction here is the relative relevance of the evidence (or potential evidence) destroyed.  Plaintiffs' motions repeatedly assert that this evidence is "critical," "central," and "key" to this case.  These assertions aside, plaintiffs' motions do not clearly explain the relevance of the evidence, apart from speculating that it might confirm their theory that Callahan created the January 10, 2007 letters (and January 9, 2007 memorandum, see supra n.12) well over a year later--a theory that is at best tangential to the question whether Callahan committed any unlawful, unfair, or deceptive act in his representation of plaintiffs.  And even assuming that the evidence would be relevant for some purpose, it would not remedy the key deficiency in plaintiffs' case.  As already discussed at length, the court

33

must enter summary judgment for defendants on the majority of plaintiffs' claims because plaintiffs have identified no admissible evidence demonstrating that Callahan's conduct legally caused them harm.  Plaintiffs do not assert that, and the court does not see how, evidence lost from Callahan's hard drives could have produced a different outcome as to those claims.

To the extent any sanction for defendants' alleged spoliation is called for, the standard sanction--an adverse inference that the destroyed evidence was harmful to defendants' case, see, e.g., Masello v. Stanley Works, Inc., 825 F. Supp. 2d 308, 319 (D.N.H. 2011)--is the appropriate one here.  That sanction will serve both to penalize defendants' wrongful conduct (if defendants' conduct can truly be called wrongful) and to deter future similar conduct.  See Companion Health Servs., 675 F.3d at 84.  For this and the foregoing reasons, plaintiffs' motion for default judgment is denied.

## IV.  **Conclusion**

For the reasons set forth above, defendants' motion for summary judgment[15] is GRANTED in part and DENIED in part, and defendants' motion to exclude testimony from plaintiffs' experts

---

[15]Document no. 72.

regarding securities registration issues[12] is GRANTED.

Plaintiffs' motions for default judgment[13] are DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  August 24, 2012

cc:  John J. Kennedy, Esq.
     Richard E. Fradette, Esq.
     Scott H. Harris, Esq.
     Steven J. Dutton, Esq.
     Holly Elizabeth Russell, Esq.
     Gregory A. Moffett, Esq.
     Kenneth Eric Rubinstein, Esq.
     William C. Saturley, Esq.

---

[12]Document no. 104.

[13]Documents nos. 70, 105.

35